IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 17-00235-01-CR-W-GAF |
| ) | |
| DARRIN L. FRY, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

Before the Court is defendant Darrin L. Fry's Motion to Suppress Evidence (Doc. #24). For the reasons set forth below, it is recommended that this motion be denied.

I. BACKGROUND

On July 10, 2017, a criminal complaint was filed charging defendant Darrin L. Fry with being a felon in possession of a firearm. On July 20, 2017, the Grand Jury returned a one-count indictment against defendant Fry. The indictment charges that on July 8, 2017, defendant, having been previously convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess, in and affecting commerce, a firearm, to wit: a Lorcin, .25 caliber semi-automatic pistol, Serial Number 226369, which had been transported in interstate commerce, contrary to Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).

On September 11, 2018, the undersigned conducted an evidentiary hearing on the motion to suppress. Defendant Fry was represented by Assistant Public Defender Stephen C. Moss. The Government was represented by Assistant United States Attorney Alison Dunning. The

Government called Officer Charles Owen, Officer Kelly Sapp, and Detective Don Stanze of the Kansas City, Missouri Police Department as witnesses. The defense called no witnesses to testify.

II. FINDINGS OF FACT

On the basis of the evidence presented at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On the morning of July 8, 2017 at approximately 7:13 a.m. Officers Charles Owen and Kelly Sapp of the Kansas City, Missouri Police Department were dispatched to assist ambulance and fire department ("EMS") personnel located at an apartment complex at 3515 E. 51st Street, Kansas City, Missouri. (Tr. at 3-5; 65-66). Officers Owen and Sapp testified that the apartment complex was located in a high crime area known for frequent emergency phone calls reporting gunshots and shootings and drug activity. (Tr. at 10-11; 67).

2. Officers Owen and Sapp arrived at the apartment complex before 7:42 a.m. and probably ten to eleven minutes after receiving the call for service. (Tr. at 9-10; 68). The officers' response was delayed because the video recording system on their patrol car was not working properly, and the officers spent several minutes attempting to fix it, but were unable to do so. (Tr. at 8-9; 67-68).

3. Prior to arriving at the scene, the officers had been told that a male was sleeping in a car that was running in the parking lot and the vehicle had been there all night. (Tr. at 6). Upon arriving at the scene, the ambulance and fire truck were there. (Tr. at 6;11). The EMS personnel informed the officers that they had requested police assistance because they had encountered the male individual in the past and he had been aggressive towards them. (Tr. at 11-12). Prior to the officers' arrival, the EMS personnel had opened the car door, turned off the engine, and removed the keys from the vehicle, but had not otherwise attempted to wake up the individual. (Tr. at 12-13).

4. Officers Owen and Sapp testified that past experience and training indicated that a person asleep at the wheel of a running motor vehicle could be an indication of a DUI or someone who is under the influence of alcohol or narcotics, or suffering from a medical condition. (Tr. at 7; 13; 73).

5. Officer Owen approached the vehicle on the driver's side while Officer Sapp approached on the passenger side. (Tr. at 12). The car was not in a parking spot, but in an area for the loading and unloading of trash. (Tr. at 71). The passenger side of the car was very close to the dumpster so Officer Sapp was towards the front of the vehicle. (Tr. at 71). Officer Owen identified the defendant as the individual he observed as he walked up to the car. (Tr. at 15). Officer Owen testified that he stood very close to defendant Fry and that he spent approximately five minutes attempting to wake up Fry by talking to him, but was unable to wake him. (Tr. at 16-17). Officer Sapp could not

2

hear a lot of what was being said, but when Officer Owen was yelling, Officer Sapp could hear him say, "Hey buddy are you okay? Do you need an ambulance?" (Tr. at 72). There was no response to these questions. (Tr. at 72).

6. At that time, multiple residents from the apartment complex had gathered near the scene. (Tr. at 17). Officer Owen asked three residents if they knew the individual, and all three stated that they did not recognize him or his car. (Tr. at 17-18). Officer Sapp also asked residents as they walked by if they knew Fry or if they recognized his car. (Tr. at 72-73). No one recognized the car or the person inside. (Tr. at 73).

7. Officer Owen testified that he again attempted to wake Fry. (Tr. at 18). He nudged Fry on the shoulder, pushing him, and screamed in his ear, at which point Fry awoke. (Tr. at 18-19). Officer Sapp recalled Officer Owen doing a sternum rub on Fry to try and wake him up. (Tr. at 89). When Fry woke up he appeared startled and started looking around. (Tr. at 19; 74). Officer Owen kept explaining why he was there and asking Fry why he was at the apartment complex and if he needed an ambulance. (Tr. at 20). Fry did not respond to Officer Owen's question about needing an ambulance. (Tr. at 20).

8. Fry finally responded that he was waiting on a friend named "Tone," but did not tell Officer Owen where "Tone" lived. (Tr. at 20). Officer Owen was suspicious based on what he observed about Fry's demeanor and because he could not elaborate more. (Tr. at 20). Officer Owen thought Fry was lying about "Tone" because if his friend lived there and if he was in communication with him, he could have used the cell phone that was in the car to call "Tone" rather than sleeping in the car and leave it running all night. (Tr. at 47)

9. Officer Owen testified that Fry did not calm down after waking up, but was fidgety and started rummaging through his belongings in the vehicle. (Tr. at 21). Officer Sapp thought Fry's response upon waking was unusual because his agitation and nervousness kept increasing. (Tr. at 75). Fry opened the center console, at which time Officer Owen observed the top of a silver slide of a gun. (Tr. at 21). Officer Owen testified that Fry immediately shut the center console very quickly. (Tr. at 21-22). When Fry lifted the console, Officer Owen was between the driver's side door and Fry. (Tr. at 21). Officer Owen had no doubt about what he had observed. (Tr. at 22).

10. Officer Sapp saw Fry lift open the center console and then slam it shut, but Officer Sapp could not see what was in the center console. (Tr. at 76). However, based upon Fry's action in closing the console quickly and looking back at the officer, Officer Sapp thought it was obvious there was something bad in there. (Tr. at 76). Officers Sapp and and Owen had been partners for five years and had their own signals. (Tr. at 76). Therefore, when Officer Owen tapped on his gun and looked at his partner, Officer Sapp knew that he was saying there was a gun in there. (Tr. at 76).

11. Officer Owen testified that in his experience, persons who are in legal possession of a firearm in their vehicle typically inform officers of the presence of the firearm in the

3

vehicle. (Tr. at 22-24). Fry did not tell him about it, and then he instantly shut the console lid so Officer Owen could not see the firearm. (Tr. at 24). Therefore, Officer Owen was concerned for possible criminal activity regarding the handgun. (Tr. at 22-24).

12. Officer Owen testified that at this point in time, he decided he needed to get Fry out of the vehicle. (Tr. at 22). Officer Owen was unsure if Fry was under the influence of alcohol or narcotics, was unsure why Fry was at the apartment complex, and was concerned about the presence of the handgun in the vehicle and the threat it posed to him, his partner and all the EMS personnel. (Tr. at 22). Officer Owen further testified that he was suspicious of Fry and his presence at the apartment complex because it was a high crime area, because of the type of call for assistance — a male asleep overnight in a running car — because it took so long for Fry to wake up, because of Fry's actions in rummaging through the center console, and then attempting to conceal the handgun from Officer Owen's view by quickly slamming the center console shut and because when the officer asked him to step out of the vehicle he tried to run. (Tr. at 27-28).

13. Officer Owen grabbed Fry by the wrist and requested that he step out of the vehicle. (Tr. at 25). At the time Officer Owen grabbed his arm to pull him out of the vehicle, Fry was not under arrest. (Tr. at 57). The officer was trying to get Fry away from the firearm for the safety of the officers. (Tr. at 58-9; 81). However, Fry was not cooperating and attempted to pull away from Officer Owen, so Officer Owen got him out of the vehicle. (Tr. at 25; 50). Officers Owen and Sapp both testified that at this point, Fry attempted to flee, but Officer Owen had his wrist and held on. (Tr. at 25; 79). Officer Sapp came around to assist his partner and there was also a line of firefighters blocking Fry's way. (Tr. at 25; 79).

14. Fry was put up against a green utility box, and put in handcuffs. (Tr. at 25; 51). The officers described Fry's conduct as being in violation of the ordinance of hindering an investigation. (Tr. at 25-26; 79-80). Once Fry did not follow the order to get out of the vehicle, but was pulling away, not following instructions and then trying to flee, he was under arrest for hindering an investigation. (Tr. at 59).

15. Fry told officers at the scene that he had been incarcerated. (Tr. at 32). Even if he had not made that statement, Kansas City protocol is that when a firearm is recover, a call is made to make sure the individual who had the firearm is not a felon. (Tr. at 32-33; 84). Officer Owen called two different detectives and learned that Fry was a felon. (Tr. at 33-34). Officers also discovered that Fry had numerous Kanas City warrants. (Tr. at 34) Fry was arrested on the warrants and pending further investigation on the felon in possession charge. (Tr. at 33-34). Fry was already in handcuffs and detained when Officer Owen discovered that he had a prior felony conviction and warrants. (Tr. at 51).

16. Once Fry was out of the vehicle and under arrest, Officer Owen recovered the handgun from the vehicle. (Tr. at 28). Fry said that the firearm in the vehicle was not his. (Tr. at 31; 48).

4

17. Fry was transported to the KCPD South Patrol Station where he was *Mirandized* and interviewed by Detective Don Stanze. (Tr. at 106). Fry signed the Miranda waiver and indicate he was willing to speak to Detective Stanze. (Tr. at 108).

### III.    DISCUSSION

Defendant Fry seeks to suppress all evidence and testimony related to such evidence as defendant claims his warrantless seizure and detention on July 8, 2017, was in violation of his rights under the Fourth Amendment. (Doc. #24 at 1). Specifically, defendant argues that his warrantless seizure and detention was not justified by any reasonable suspicion that he was involved in any type of criminal activity (Id. at 2). Defendant Fry states that he was not trespassing or causing a disturbance while he slept in his vehicle, that his "startled" appearance was an appropriate reaction upon being woken up, and that carrying a concealed firearm is legal in Missouri. (Id. at 3). Therefore, defendant contends that his seizure by the officers was unjustified, and the later discovery of his outstanding warrants and previous felony conviction does not excuse the unjustified seizure. (Id. at 4).

A police officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000)(citing Terry v. Ohio, 392 U.S. 1, 30 (1968)). "[A] 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence[.]" Wardlow, 528 U.S. at 123. An officer conducting an investigatory stop is permitted to take steps that are "reasonably necessary to protect their personal safety and to maintain the status quo so that the limited purposes of the stop may be achieved." U.S. v. Jones, 759 F.2d 633, 636–37 (8th Cir. 1985)(quoting U.S. v. Hensley, 469 U.S. 221 (1985)) (internal quotations omitted). Such steps may include ordering the driver of a vehicle to step out of the car, or placing a suspect in handcuffs. See Pennsylvania v. Mimms, 434 U.S. 106, 111

5

(1977)(officer permitted to order driver to step out of the vehicle); U.S. v. Fisher, 364 F.3d 970, 973 (8th Cir. 2004)(officer permitted to constrain suspect in handcuffs).

In this case, the seizure of Defendant Fry was justified. The officers were called to assist EMS personnel in checking on an individual, later determined to be Darrin Fy, who was reported to have been sleeping overnight in a running car. (Fact Nos. 1 and 3). The car was located at an apartment complex in a high crime area. (Fact No. 1). Upon arrival, the EMS personnel informed Officer Owen that they had encountered the individual sleeping in the car in the past and he had been aggressive towards them. (Fact No. 3). The officers' training and experience in dealing with individuals found asleep at the wheel of a motor vehicle led them to believe that Fry might be under the influence of alcohol or narcotics or might be suffering from a medical condition. (Fact. No. 4).

Officer Owen was unable to awaken Fry by simply speaking to him. (Fact No. 5). Fry did not wake up until Officer Owen pushed his shoulder and screamed in his ear. (Fact No. 7). While Officer Owen was trying to wake Fry up, both he and Officer Sapp asked people in the apartment complex if they recognized the sleeping individual or his car. (Fact No. 6). No one recognized him. (Fact No. 6).

Once awake, Fry seemed startled and anxious. (Fact No. 7). He did not respond to questions about whether he needed an ambulance. (Fact No. 7). When Officer Owen asked Fry why he was present at the apartment complex, Fry answered that he was waiting on his friend "Tone" but could not tell the officer where "Tone" lived. (Fact No. 8). Officer Owen suspected this story was a lie for several reasons including Fry's demeanor, his inability to elaborate further and because he had a cell phone which he could have used to call "Tone" rather than sleep in the car overnight. (Fact No. 8). Additionally Fry did not calm down as the officer spoke with him, but was fidgety and his

6

agitation increased. (Fact No. 9).  As Fry rummaged around in the car, he opened the center console enabling Officer Own to see the silver slide of a gun. (Fact No. 9).  Fry then immediately slammed the console shut as if to hide the firearm from Officer Owen's view.  (Fact No. 9).  Officer Owen thought Fry's actions in regards to the firearm were suspicious because in his experience persons in legal possession of a firearm usually inform officers about the presence of the firearm, but in this case, Fry did not do so.  (Fact. No. 11).   At this point in time, Officer Owen was still unsure if Fry was under the influence of alcohol or narcotics, but having seen a firearm he wanted to get Fry away from the firearm for officers' safety. (Fact No. 12).

Officer Owen had more than a reasonable suspicion that Fry was involved in criminal activity, including a possible DUI or narcotics related offense, trespassing, and/or possibly illegal possession of a firearm, therefore justifying a brief investigative stop under Terry v. Ohio, 392 U.S. 1.  Furthermore, once he observed a firearm in the vehicle, the officer was permitted to order Fry out of the vehicle for safety reasons, in order to continue his brief investigation of Fry away from the firearm.  See Mimms, 434 U.S. at 111.  Fry's refusal to comply and subsequent attempt to flee, see fact no. 13, more than justified the officers' use of handcuffs and their detention of defendant. See Fisher, 364 F.3d at 973.  At that point, the officers had a reasonable basis to arrest Fry for hindering an investigation. (Fact No. 14). The officers almost immediately became aware of  Fry's warrants and status as a convicted felon. (Fact No. 15).   The discovery of Fry's outstanding warrants and felony conviction provided a further basis for his arrest.  Because there was no violation of defendant's Fourth Amendment rights, defendant's request that the Court suppress the firearm and any other evidence obtained as a result of the stop, including his later Mirandized statements, should be denied.

7

Case 4:17-cr-00235-GAF   Document 39   Filed 10/10/18   Page 7 of 8

## IV. CONCLUSION

Based on the foregoing, it is RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Darrin L. Fry's Motion to Suppress (Doc. #24).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

                                                    */s/ Sarah W. Hays*
                                                    SARAH W. HAYS
                                       UNITED STATES MAGISTRATE JUDGE